Filed 9/29/16  Thompson v. Inglewood Unified School Dist. CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| GLENSTON C.B. THOMPSON, | B264151 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC537316) |
| v. | |
| INGLEWOOD UNIFIED SCHOOL DISTRICT, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Mark Mooney, Judge.  Affirmed.

Gronemeier & Associates, Dale L. Gronemeier, Elbie J. Hickambottom, Jr., for Plaintiff and Appellant.

Olivarez Madruga, Thomas M. Madruga, Deborah Lee-Germain for Defendant and Respondent.

_____

Plaintiff Glenston Thompson appeals from a judgment entered in favor of defendants Inglewood Unified School District (IUSD), La Tanya Kirk-Carter, and Donald Brann, Ed.D. (collectively, defendants), after the trial court granted defendants' anti-SLAPP motion under Code of Civil Procedure section 425.16[1] in this action for breach of a settlement agreement, defamation, and other causes of action. We affirm.

## BACKGROUND

**Thompson's Employment with IUSD and His Action Challenging His Termination**

In July 2011, when IUSD hired plaintiff Thompson as its Chief Operating Officer, IUSD was a struggling school district on the verge of insolvency. In September 2012, approved legislation placed IUSD under a state receivership, requiring the Superintendent of Public Instruction (Superintendent) to "assume all legal rights, duties, and powers of the governing board" of IUSD and to appoint a state administrator to act on the Superintendent's behalf. (Sen. Bill No. 533 (2011-2012 Reg. Sess.) § 3.) On or about October 3, 2012, the Superintendent appointed Kent Taylor to the position of State Administrator. One week later, IUSD hired defendant Kirk-Carter as its Assistant Superintendent of Business Services. In November 2012, Taylor terminated Thompson's employment with IUSD. Taylor resigned as State Administrator on or about December 4, 2012, and the Superintendent immediately appointed Kirk-Carter to the position of Interim State Administrator.

In February 2013, Thompson filed an action against IUSD, Taylor, Kirk-Carter and other defendants, challenging his termination. (*Thompson v. Inglewood Unified School Dist.* (Super. Ct. L.A. County, 2013, No. BC500423).) In March 2013, Thompson settled with IUSD, Taylor and Kirk-Carter. IUSD agreed to pay Thompson $109,771, and Thompson agreed to dismiss the case as to all defendants (including the non-settling defendants). The settlement agreement included a mutual non-disparagement clause, stating:

---

[1] Further statutory references are to the Code of Civil Procedure unless otherwise indicated.

2

"Plaintiff [Thompson] and Defendants agree that they shall hereafter not disparage each other. Defendants agree that any employment inquiries concerning Plaintiff shall be directed to the HR Director of IUSD and that the IUSD HR Director shall respond to employment inquiries concerning Plaintiff by providing only his dates of employment, his title, his salary, and the statement that it is IUSD's policy to respond to employment inquiries with only the foregoing information. Nothing herein shall preclude nor require any present or prior IUSD employee giving Plaintiff an employment reference. Nothing herein shall apply to or preclude Plaintiff or Defendants or Defendants' employees from being interviewed concerning any disputed claims or testifying in any legal proceeding."

**Kirk-Carter's Statements About Thompson—the Gravamen of the Present Action**

As part of Kirk-Carter's duties as Interim State Administrator, she reviewed and collected data regarding IUSD's financial condition and reported the data to the California Department of Education (CDE) and the Fiscal Crisis Management Assistance Team (FCMAT), an agency created by state statute. In April 2013, as part of her review of IUSD's financials, Kirk-Carter learned that approximately $2 million in funds earmarked for the Los Angeles Unified School District (LAUSD) had been inadvertently deposited into IUSD's account. Although these funds did not belong to IUSD and were supposed to be returned to LAUSD, IUSD's general ledger did not reflect these funds as a payable. Kirk-Carter reported this issue to FCMAT. In his complaint, Thompson alleged, on or about April 16, 2013, Kirk-Carter orally informed Debi Deal at FCMAT that Thompson had instructed IUSD staff "not to set up a payable" for the approximately $2 million in LAUSD funds. This is the first of two communications by Kirk-Carter that form the basis of Thompson's claims for breach of the non-disparagement clause, defamation, and other causes of action in the present action.

In or about June 2013, Kirk-Carter determined that IUSD's financials understated employee vacation time because IUSD reported only vacation time accrued in accordance with school board policy and not the additional vacation hours employees actually were carrying. This discrepancy impacted IUSD's budget and the calculations for its fiscal recovery plan. Several management-level employees were retiring from IUSD and would

3

be cashing out large vacation balances.  On or about June 10, 2013, Kirk-Carter sent an email to CDE, reporting this issue.[2]

On or about June 18, 2013, the Superintendent appointed Dr. Donald Brann as the State Administrator, and Kirk-Carter returned to her position as Assistant Superintendent of Business Services.  In this position, Kirk-Carter continued to make reports to CDE and FCMAT regarding IUSD's financial condition.

On July 2, 2013, Kirk-Carter sent an email to Debi Deal at FCMAT, with copies to CDE and IUSD personnel, stating she was available for a proposed meeting but would not be able to make her report on IUSD's cash flow until after the meeting, when IUSD resolved the vacation payouts to retirees.  This is the second of the two communications by Kirk-Carter on which Thompson bases the causes of action in the present action.  Discussing the vacation accrual issue, Kirk-Carter stated in the email she had "stumbled on[to] an accounting scheme [IUSD] had been doing."  Thompson had instructed an IUSD employee "to only report board policy for vacation accrual not actual[,] thus keeping two sets of books and a much higher liability for a vacation payout than what was known once these folks have retired."  According to the email, the discovery of the issue had altered IUSD's projected summer cash flow in a negative manner.

**The Present Action**

On February 24, 2013, Thompson filed his complaint in this action, asserting causes of action for breach of contract (the non-disparagement clause in the settlement agreement), defamation, and promissory fraud (based on the promise not to disparage Thompson) against IUSD and Kirk-Carter.  Thompson alleged Kirk-Carter's April 16, 2013 and July 2, 2013 statements "reasonably carried the disparaging meaning to the audience of the statements that Thompson had engaged in dishonest and inaccurate manipulation of the financial records of IUSD."  Thompson sought to "recover from

---

[2] This June 10, 2013 communication is not one of the alleged disparaging and defamatory statements Thompson relies on in support of his causes of action, but it highlights the same financial issue Kirk-Carter subsequently raised in the second of the two communications with which Thompson takes issue, as set forth below.

4

IUSD and from Kirk-Carter damages to his reputation in a sum estimated to be at least $1,000,000 " or, in the alternative, "reliance damages of the lost value of his [prior settled] lawsuit in a sum estimated [to be] at least $500,000 . . . ." He also sought punitive damages based on allegations Kirk-Carter had made the alleged disparaging and defamatory statements with malice and without reasonably believing they were true because (1) she was "hostile to Thompson" due to the settlement he had obtained in his wrongful termination lawsuit against her and (2) she needed a "scapegoat" after she "negligently underestimated expenses and liabilities of IUSD" and believed her understatement "would harm her prospects of becoming the permanent State Administrator." Thompson also asserted a cause of action for due process violations against "Dr. Brann in his official capacity," seeking equitable relief in the form of a "name-clearing evidentiary hearing by IUSD."

On May 30, 2014, defendants filed their anti-SLAPP motion under section 425.16, asking the trial court to strike Thompson's complaint. Defendants argued the causes of action in the complaint arise from protected activity within the meaning of the anti-SLAPP statute, and Thompson cannot demonstrate a probability of prevailing on the causes of action because, among other things, (1) Kirk-Carter made the communications in the "proper discharge of an official duty" (Civ. Code, § 47, subd. (a)) and the communications are therefore privileged and (2) the communications did not violate the non-disparagement clause because that clause pertains only to employment inquiries. Defendants sought an award of attorney fees and costs under section 425.16, subdivision (c).

In his written opposition to the anti-SLAPP motion, Thompson argued (1) defendants' motion was not timely filed, (2) defendants "contractually waived the protection of the anti-SLAPP statute" by entering into the settlement agreement with the non-disparagement clause, (3) defendants did not demonstrate the causes of action arose from protected activity because Kirk-Carter's statements were not made in connection with a public issue, (4) the privilege set forth in Civil Code section 47, subdivision (a), is inapplicable to Kirk-Carter's statements, (5) the non-disparagement clause is not limited

5

to employment inquiries, and (6) Thompson can demonstrate a probability of prevailing on each of his causes of action.

In support of his opposition, Thompson submitted a declaration from Latrice Harris, IUSD's Payroll Benefits Manager. As manager, she was responsible for "keeping vacation accrual records" for IUSD employees. Harris's "line of supervision was, when the position was filled, the Director of Fiscal Services, who in turn reported to the Chief Operating Officer ('COO'), and, when the position was not filled, the COO." Thompson was IUSD's COO from July 1, 2011 to October 12, 2012.

In her declaration, Harris confirmed IUSD maintained two sets of records for recording vacation: (1) "an annual liability report that included vacation liability" and (2) "manual vacation records." The annual liability report included "only the vacation entitlement that was set by the Board" of Education—"10 carry-over days in addition to the current year's vacation pay entitlement." The manual vacation records, on the other hand, "recorded all accrued vacation days irrespective of any limits on carrying over vacation days from year to year." The manual records "were the definitive records reflecting employees['] accruals and use of vacation days" and were used for "verifying employees' entitlement to be paid for vacation pays and to prepare reports such as the liability report." According to Harris, "The practice for preparing the annual liability report in this manner was a practice that existed before [she] began working for IUSD (and before Mr. Thompson began working) and that [she] continued while [she] was Payroll Supervisor," a position she held prior to her promotion to Payroll Benefits Manager.

Harris further stated, "Thompson never gave [her] any direction concerning the manner that IUSD vacation accrual records should be maintained or the annual liability reports should be prepared." In responding to Kirk-Carter's inquiries about why the cost for the vacation-accrual payments to retirees was so "high," Harris, "did not place any responsibility on Mr. Thompson for the manner in which the records were maintained and the annual report generated." Rather, she "told Ms. Kirk-Carter that it was the way things had always been done before [she] began working for IUSD in August 2010."

6

Kirk-Carter "proposed and implemented" an early retirement plan "without any inquiries to the Payroll Office or to [Harris] as to what IUSD's liability would be for vacation pay from the early retirement plan."[3]

The trial court heard oral argument on the anti-SLAPP motion and granted it, in part. The court found the motion was timely, defendants met their burden of showing Kirk-Carter's statements constituted protected activity within the meaning of section 425.16 because they "involve[ed] a matter of public interest," and Thompson did not meet his burden of demonstrating a probability of prevailing on the merits because Kirk-Carter's statements were not defamatory or disparaging. The court denied the motion as to a part of Thompson's breach of contract cause of action which alleged IUSD had not paid him all amounts due under the settlement agreement.

The parties stipulated that Thompson would voluntarily dismiss the remaining portion of his breach of contract action "subject only to re-asserting it if he successfully appeals [the] judgment." The parties also stipulated to a $9,642.50 award of attorney fees for defendants. On April 20, 2015, the trial court entered judgment in favor of defendants and against Thompson.

## DISCUSSION

### Timeliness of Anti-SLAPP Motion

Thompson contends defendants' anti-SLAPP motion was not timely filed. We disagree.

Under section 425.16, subdivision (f), an anti-SLAPP motion "may be filed within 60 days of the service of the complaint or, in the court's discretion, at any later time upon terms it deems proper." The "60-day period for filing the motion runs from service of the most recent amended complaint, rather than the original complaint." (*Yu v. Signet Bank/Virginia* (2002) 103 Cal.App.4th 298, 314.)

---

[3] Thompson submitted his own declaration in support of his opposition to the anti-SLAPP motion, and it is consistent with Harris's declaration regarding the IUSD employee vacation accrual issue.

Thompson originally filed his causes of action against IUSD and Kirk-Carter for breach of contract, defamation, and due process violations on September 18, 2013, in a case in which another plaintiff, William T. Carter III, asserted unrelated claims for defamation and other causes of action. (*Carter v. Inglewood Unified School Dist.* (Super. Ct. L.A. County, 2013, No. BC521830).) In a first amended complaint, Thompson and Carter also asserted causes of action against Dr. Brann. After the trial court sustained defendants' demurrer to the first amended complaint on the ground Thompson and Carter had mis-joined their unrelated cases against defendants, the court granted Thompson leave to file a separate and amended complaint in a new action.

As set forth above, Thompson filed his complaint in this action on February 24, 2014. He asserted a new cause of action for promissory fraud that he had not asserted in his joint action with Carter. Defendants filed their anti-SLAPP motion on May 30, 2014. Thompson concedes defendants filed their motion within 60 days of service of the operative complaint in this new action.

The 60-day deadline to file the anti-SLAPP motion did not run from service of the first amended complaint in the prior joint action with Carter. It ran from service of the complaint in this action, an amended pleading. (*Yu v. Signet Bank/Virginia*, *supra*, 103 Cal.App.4th at p. 314.) Defendants' anti-SLAPP motion was timely filed.

**Standard of Review**

"Review of an order granting or denying a motion to strike under section 425.16 is de novo." (*Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 269, fn. 3 (*Soukup*).) "We consider 'the pleadings, and supporting and opposing affidavits . . . upon which the liability or defense is based.' (§ 425.16, subd. (b)(2).) However, we neither 'weigh credibility [nor] compare the weight of the evidence. Rather, [we] accept as true the evidence favorable to the plaintiff [citation] and evaluate the defendant's evidence only to determine if it has defeated that submitted by the plaintiff as a matter of law.'" (*Id.* at p. 269, fn. 3.)

8

**Section 425.16**

Under section 425.16, a party may move to dismiss "certain unmeritorious claims that are brought to thwart constitutionally protected speech or petitioning activity." (*Robinzine v. Vicory* (2006) 143 Cal.App.4th 1416, 1420-1421.) Section 425.16 provides: "A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." (§ 425.16, subd. (b)(1).)

In evaluating an anti-SLAPP motion, we conduct a two-step analysis. First, we must decide whether the defendant "has made a threshold showing that the challenged cause of action arises from protected activity." (*Taheri Law Group v. Evans* (2008) 160 Cal.App.4th 482, 488.) For these purposes, protected activity "includes: (1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law, (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law, (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest, or (4) any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." (§ 425.16, subd. (e).)

Second, if the defendant makes this threshold showing, we decide whether the plaintiff "has demonstrated a probability of prevailing on the claim." (*Taheri Law Group v. Evans*, *supra*, 160 Cal.App.4th at p. 488.) To satisfy its burden, the plaintiff "'must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited.'" (*Soukup*, *supra*, 39 Cal.4th at p. 291.) The trial court must deny an anti-SLAPP motion "'"if the plaintiff presents evidence establishing a prima

9

facie case which, if believed by the trier of fact, will result in a judgment for the plaintiff. [Citation.]"'" (*Robinzine v. Vicory*, *supra*, 143 Cal.App.4th at p. 1421.) At this stage of the proceedings, the plaintiff "need only establish that his or her claim has 'minimal merit.'" (*Soukup*, *supra*, 39 Cal.4th at p. 291.) Although "'the court does not *weigh* the credibility or comparative probative strength of competing evidence, it should grant the motion if, as a matter of law, the defendant's evidence supporting the motion defeats the plaintiff's attempt to establish evidentiary support for the claim.'" (*Ibid.*)

## Step 1: Arising from Protected Activity

On appeal, Thompson fails to dispute his causes of action arise from protected activity within the meaning of the anti-SLAPP statute. Kirk-Carter made the statements "in furtherance of the exercise of the constitutional right of . . . free speech in connection with a public issue or an issue of public interest." (§ 425.16, subd. (e)(4).) She was reporting IUSD's financial condition to CDE and FCMAT. Defendants satisfied their burden of making "a threshold showing that the challenged cause[s] of action arise[] from protected activity." (*Taheri Law Group v. Evans*, *supra*, 160 Cal.App.4th at p. 488.) Accordingly, the burden shifted to Thompson to demonstrate a probability of prevailing on his claims.[4]

## Step 2: Probability of Prevailing on the Claims

All of the causes of action in Thompson's complaint are based on Kirk-Carter's April 16, 2013 and July 2, 2013 statements and Thompson's allegations the statements were disparaging and/or defamatory. Thompson has not satisfied his burden of

---

[4] Thompson argues defendants waived the protections of the anti-SLAPP statute when they agreed to be bound by the non-disparagement clause. Not so. The mere existence of the non-disparagement clause does not defeat defendants' ability to meet their burden on step 1 of showing the causes of action arise from protected activity. Defendants have met their burden. Whether or not Kirk-Carter's speech violated the non-disparagement clause is an issue more appropriately addressed in the step 2 probability of prevailing on the claims analysis. As discussed below, Thompson cannot show Kirk-Carter violated the non-disparagement clause or defamed Thompson with her statements.

10

demonstrating a probability of prevailing on his claims because the evidence shows the statements are not actionable.

First, we agree with defendants' assertion the statements are privileged under the executive officer privilege of Civil Code section 47, subdivision (a), as "publication[s]" made "[i]n the proper discharge of an official duty." The "executive privilege broadly 'encompass[es] all discretionary acts essential to the proper exercise of an executive function' decision." (*Morrow v. Los Angeles Unified School Dist.* (2007) 149 Cal.App.4th 1424, 1442 [statements by a school district's superintendent and local superintendent to the press regarding a high school principal's impending replacement were privileged under the executive officer privilege of Civ. Code, § 47, subd. (a)].)

As Interim State Administrator, Kirk-Carter was tasked with the official duty of reporting information about IUSD's financial condition to CDE and FCMAT. Thompson does not dispute Kirk-Carter's alleged April 16, 2013 oral report to FCMAT about IUSD's improper recording of the $2 million in LAUSD funds—made while Kirk-Carter was Interim State Administrator—was privileged under Civil Code section 47, subdivision (a). He argues, however, that Kirk-Carter's July 2, 2013 email to FCMAT and CDE about the vacation accrual issue—made two weeks after Kirk-Carter was demoted from Interim State Administrator to her former position as Assistant Superintendent of Business Services—is not similarly privileged because the executive officer privilege no longer applied to her. We disagree. Kirk-Carter began reporting to CDE about the vacation accrual issue in June 2013, while she was still the Interim State Administrator. Her July 2, 2013 follow-up email to CDE and FCMAT reporting on the same subject remains privileged.

"Since the executive privilege is 'an expression of a policy designed to aid in the effective functioning of government,' the [United States Supreme Court] reasoned in *Barr* [*v. Matteo* (1959) 360 U.S. 564] that it should be extended to lower officials to the extent necessary to carry out that policy. [Citation.] 'It is not the title of his office but the duties with which the particular officer . . . is entrusted . . . which must provide the guide in delineating the scope of the rule which clothes the official acts of the executive

11

officer with immunity from civil defamation suits.'" (*Copp v. Paxton* (1996) 45 Cal.App.4th 829, 841.) Here, Kirk-Carter was carrying out the same duty as Assistant Superintendent of Business Services that she had been carrying out two weeks prior as Interim State Administrator—to make reports to CDE and FCMAT about IUSD's financial condition, including its vacation liability policies. The July 2, 2013 email therefore was privileged under Civil Code section 47, subdivision (a).[5]

Second, even assuming the executive officer privilege is inapplicable to Kirk-Carter's statements, Thompson cannot demonstrate a probability of prevailing on any of his causes of action because he cannot show Kirk-Carter violated the non-disparagement clause or defamed Thompson with her statements. In opposition to the anti-SLAPP motion and on appeal, Thompson ignored one of the two statements he alleged in his complaint—Kirk-Carter's April 16, 2013 oral report to FCMAT about IUSD's improper recording of the $2 million in LAUSD funds—and failed to show this statement was defamatory or violated the non-disparagement clause. He has focused exclusively on the July 2, 2013 email, taking issue with Kirk-Carter's statements about IUSD's "accounting scheme" and "two sets of books" regarding employee vacation accrual.

As discussed above, in opposition to the anti-SLAPP motion, Thompson presented evidence (the declaration of Latrice Harris) demonstrating, during his tenure as IUSD's Chief Operating Officer, IUSD maintained two sets of records for recording vacation: (1) an annual liability report that recorded vacation liability in accordance with the Board of Education's policy of allowing only 10 days of vacation to carry over and (2) manual vacation records, reflecting employees' true vacation balances in disregard of the vacation carry-over policy. The annual liability report underestimated IUSD's vacation liability for those employees who had carried over more than 10 days of vacation. When an employee retired, IUSD paid the employee for the vacation balances reflected in the

---

[5] We need not address Thompson's arguments that defendants waived the protection of the executive officer privilege by entering into a settlement agreement with a non-disparagement clause. As discussed below, Kirk-Carter did not make any statements that violated the non-disparagement clause.

12

manual records. Under Thompson's management, this was the particular scheme[6] IUSD employed to account for vacation balances. Regardless of whether Thompson instituted this accounting scheme, he permitted it and thereby tacitly approved its continuation. Based on Thompson's own evidence, the statements about an "accounting scheme" and "two sets of books" were not disparaging or defamatory, they were an accurate reflection of the vacation accrual policies. Kirk-Carter made these statements in explaining to CDE and FCMAT why IUSD's cash flow would be lower than expected. These statements did not violate the non-disparagement clause in the settlement agreement.

Kirk-Carter was tasked by the State with the duties of investigating and reporting IUSD's financial condition. The non-disparagement agreement did not prevent her from performing her state-mandated duty to make reports about policies which impacted IUSD's financial condition, even if the reports were negative.

Because all of Thompson's causes of action are based on the existence of statements that violate the non-disparagement clause or defame Thompson, and Thompson has failed to demonstrate Kirk-Carter made such an actionable statement, he cannot show that any of his causes of action has even the minimal merit necessary to survive the anti-SLAPP motion. The trial court did not err in granting the motion.

## DISPOSITION

The judgment is affirmed. IUSD is entitled to recover costs and attorney fees on appeal under section 425.16, subdivision (c).[7]

NOT TO BE PUBLISHED.


                                                    CHANEY, Acting P. J.

WE CONCUR:


        JOHNSON, J.                          LUI, J.

---

[6] We use the term "scheme" to mean a fixed plan or arrangement.

[7] Defendants Kirk-Carter and Donald Brann did not appear on appeal. Only IUSD is seeking an award of attorney fees on appeal under section 425.16, subdivision (c).

13